Filed 9/22/25  In re Haylie S. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| In re HAYLIE S. et al., | B342753 |
| Persons Coming Under the Juvenile Court Law. | (Los Angeles County Super. Ct. No. 24CCJP03416) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JOSE S., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Natalie Nardecchia, Judge.  Affirmed.

Susan M. O'Brien, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Senior Deputy County Counsel, for Plaintiff and Respondent.

———————————

Jose S. (Father) appeals from the juvenile court's assertion of jurisdiction over his children Haylie (born 2015), Harley (born 2017), Hunter (born 2019), Joe (born 2021), and Jacob (born 2023), and a dispositional order removing them from his care while dependency proceedings progressed.  The children's mother, Cristina R. (Mother), is not a party to this appeal.

Mother and Father have lived separately for several years. Before the dependency case began, all five children lived with Mother and visited with Father.  At the adjudication hearing, the court sustained two counts in a Welfare and Institutions Code[1] section 300 petition: one alleging Mother maintained an unsanitary and hazardous home environment without appropriate supervision of the children; and one alleging Father had a history of methamphetamine abuse, was a recent abuser of marijuana and alcohol which rendered him incapable of providing regular child care and supervision, and further that Mother failed to protect the children from Father's substance abuse.  The juvenile court removed the children from Father, ordered them released to Mother, and granted Father unmonitored visitation.

During the pendency of this appeal, the juvenile court terminated jurisdiction over all five children with juvenile custody orders (commonly called exit orders) that awarded

———————————

[1] Unspecified statutory references are to the Welfare and Institutions Code.

2

Father and Mother joint legal custody, Mother sole physical custody, and Father unmonitored visitation. Father has filed a separate appeal from those exit orders. Although Father's current appeal is moot, we exercise our discretion to consider it because its merits will potentially impact his later appeal of the exit orders. As substantial evidence supports the court's exercise of jurisdiction and its initial removal of the children from Father, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

We limit our summary of the factual and procedural background to what is necessary to explain our disposition.

### A. Facts Leading to the Filing of the Dependency Petition

#### 1. *Family Dependency History*

In 2007, Father was the subject of a referral involving two older and now adult children that resulted in a voluntary case. In January 2020, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging Mother was depriving Harley of necessary sleep, which DCFS reported that it "[e]valuated [o]ut."[2] In May 2022, DCFS received a referral that the family was in a car accident while Father was driving. Haylie and two of her siblings were not wearing seatbelts, and Haylie fractured her hip when the collision threw her from the back of the car. The reporting party also stated that Father had a history of methamphetamine use. The referral was also "[e]valuated [o]ut." Also in May 2022, either as a result of

---

[2] The record does not explain what DCFS meant by this or what evaluating out the referral entailed.

injuries from this car accident or some other one, Father became disabled.

2. *Referral Involving Hunter*

On October 23, 2024, a passerby found Hunter (then five years old) on the street alone at night near the Los Angeles Port Police station. Security camera footage showed the child had been outside on his own for approximately 45 minutes before a bystander intervened. When police responded, the child pointed to his apartment building and was escorted back home. Mother was not present at the apartment; no family member living there was aware Hunter had left and was outside alone. When contacted by phone, Mother told the police she had left to buy gas and beer and did not tell anyone Hunter was staying behind at the apartment. The apartment had a strong foul odor and was infested by cockroaches. Mother was arrested for child neglect and endangerment, and the incident referred to DCFS.

## B. Pre-petition Investigation

After the referral, DCFS conducted interviews and learned the following. Mother and the children had lived with maternal grandmother (MGM) and her family in the apartment since March 2024. Mother said that for the past five years Father lived separately in a type of sober living home but the two still maintained their relationship. Mother said Father had a history of abusing "crack" but currently was sober. Father was not allowed at MGM's apartment complex because he had threatened the building manager. Mother said Father was great with the children and they visited him at his home.

Father said he had been at the sober living home for over four years. Father disclosed he had a criminal history; a later search showed multiple arrests for spousal battery and driving

under the influence. He indicated he had battled substance addiction, primarily methamphetamine, for over 10 years. Father said that after his injury in 2022, he "was lost and coping with drugs was the only thing at the time that helped." Father had recently completed an inpatient substance addiction program, had been sober for a few months, and was willing to do an on-demand drug test. He also admitted that he had backslid a few times on his sobriety. Father asked DCFS to release the children to him and said the two youngest children had recently spent the night with him. In a later discussion, Father told DCFS that the children stayed with Mother because he did not have enough space for them and that he was currently unable to take them because he was focusing on his substance abuse concerns.

Haylie denied seeing Father smoking or drinking intoxicants. Harley said she saw Father smoking something but could not describe it further. She said she felt safe when visiting Father.

Father's landlord said Father had lived in her home for approximately three years. It was not a transitional living home, but she provided rooms to fellow recovering addicts. The landlord denied Father had any current substance abuse problem and had no concerns about his parenting. The landlord said Father was a great dad and the children were welcome in her home.

## C.    Dependency Petition and Initial Hearings

On October 28, 2024, DCFS filed a section 300 petition. As pertinent here, the petition alleged Mother maintained an unsanitary and hazardous home environment without appropriate supervision of the children (count b-2), and that Father had a history of substance abuse and was a recent abuser

5

of methamphetamine, which rendered Father incapable of providing regular care and supervision, and further that Mother failed to protect the children from Father's substance abuse (count b-3).[3]  At the initial hearing, the court ordered the children detained from Father, released them to Mother on the condition that Mother and the children reside with a maternal aunt, and permitted DCFS to make unannounced home assessment visits. The court also set a progress report hearing for November 13, 2024, concerning the children's possible release to Father as well as Mother.

Before the November 13, 2024 hearing, a records check showed one of Father's roommates was a registered sex offender. Accordingly, at the November 13, 2024 hearing, Father withdrew his request for release of the children to him.  He instead asked for more extended visitation, including overnights, at a DCFS-approved location.  The court deferred that decision to the December 3, 2024 adjudication and disposition hearing because Father had not yet suggested any location for visitation other than his residence, and DCFS thus had not yet had an opportunity to evaluate any such location.

D.    **Additional Investigation Before the Adjudication and Disposition Hearing**

When Mother was re-interviewed, she said Father used to live with her, but he was not on the apartment lease and had to move out after several incidents.  One of those incidents involved an altercation with the property manager's husband, and Father

---

[3] The petition contained additional allegations which the court eventually struck at the adjudication hearing.  As those allegations are not at issue, we do not detail them.

was no longer allowed on the premises.  Mother said Father stopped using drugs after she insisted.  She said Father did still drink occasionally because of leg pain, and she told him he needed help.  Mother said that even a little alcohol changed Father's personality and, "If I can tell he's been drinking and it becomes a problem, I remove us from the situation."  She was able to co-parent with Father from their separate homes.

Father said DCFS either misheard or misconstrued what he said in their prior discussion, because he had not relapsed after finishing his rehabilitation program and had been clean since 2022 "from everything except marijuana and alcohol a select few times."  Father tested positive for marijuana metabolite on October 26 (1124 ng/mL), November 5 (583 ng/mL), and November 13, 2024 (235 ng/mL).

Father said Mother found out about his addiction during the COVID-19 pandemic and told him to get sober or she would not let him see the children anymore.  That ultimatum led to him completing a program at Harbor-UCLA Medical Center.  Father returned to Harbor-UCLA several times to find a therapist and for relapse prevention.  He was prescribed Naltrexone and Gabapentin to stave off cravings, but he did not take them because they made him feel unwell.  Instead, when he felt overwhelmed, he talked to someone from Alcoholics Anonymous (AA).  DCFS noted that outside of his interviews Father had called the dependency investigator a few times to say Father was mentally unwell, and that during one of these calls Father sounded like he was having a mental breakdown.

Father reported he co-parented well with Mother.  Father said he was in a car accident in May 2022 that left him disabled; Mother and he struggled but worked together to take care of the

children.  He denied previously telling DCFS he could not take physical custody of the children, but continued to say he could not take all five children at once because of space issues at his home. He said paternal aunt was the only person with whom he could place the children if they were released to him.  When DCFS spoke to the paternal aunt, she was unwilling to house the children because her home was already at full capacity.

Father confirmed Mother's statement about him getting into an altercation with the management of her apartment building and being told to move out.  Father said that after he moved out of the apartment he shared with Mother he was homeless until he met his current landlord a few years ago.

Father's landlord said she was in recovery and met Father at an AA meeting.  She was blind but said she would know if Father was under the influence.  In her opinion, Father was clean and sober and had been for almost three years.

MGM told DCFS she did not believe Father still used drugs but knew that he continued to drink alcohol.  MGM said she did not get along with Father but had no concerns with him visiting with the children.  MGM did not think the children should reside with Father full-time because he was not as patient with them as Mother was.

## E.    The Adjudication and Disposition Hearing

On December 3 and 6, 2024, the juvenile court held a combined adjudication and disposition hearing.  Mother pleaded no contest to counts b-2 and b-3 as alleged against her.

Counsel for Father and the minors asked the court to dismiss count b-3 alleged against Father because he posed no current risk to the children.  The court disagreed and sustained the count, interlineating it to state:  Father "has a history of

substance abuse, including methamphetamine and is a recent abuser of marijuana and alcohol, which renders . . . [F]ather incapable of providing regular care and supervision of the children.  The children Haylie, Joe, and Jacob are of such a young age requiring constant care and supervision and . . . [F]ather's substance abuse interferes with providing regular care and supervision of the children. . . .  [F]ather's substance abuse and . . . [M]other's failure to protect the children, endangers the children's physical health and safety, creates a detrimental home environment, and places the children at risk of serious physical harm, damage, danger, and failure to protect."

In sustaining count b-3, the court focused on the current risk Father posed to the children.  The court observed Father had an ongoing struggle with sobriety, noted the evidence of his continued drinking to deal with physical pain, and pointed to Mother's statement about the change in Father's personality when he drank even a small amount of alcohol and her need to remove the children from Father when that happened.

As for disposition, Father's counsel asked for a home-of-both-parents order.  Minors' counsel submitted on the case plan, which provided for placement of the children with Mother.  The court removed the children from Father, placed them with Mother, ordered Father's unmonitored visits to continue with DCFS having discretion to liberalize them, and ordered Father to participate in services including individual counseling, a 12-step program, and drug/alcohol testing.

Father timely appealed.

## F.    Post-adjudication and Disposition Hearing Events

On July 25, 2025, the juvenile court terminated jurisdiction over all five children.  It awarded the parents joint legal custody,

9

sole physical custody to Mother, and unmonitored day visitation for Father. On July 30, 2025, the court entered exit orders confirming those custody terms. We sua sponte augment the record to include these orders. (Cal. Rules of Court, rule 8.155(a)(1)(A).) On July 30, 2025, Father filed a timely notice of appeal from the exit orders.

## DISCUSSION

### A. We Exercise Our Discretion to Consider Father's Moot Appeal

As the juvenile court has terminated jurisdiction and ordered unmonitored visitation for Father, Father's appeal that the court erred in asserting jurisdiction and in ordering the children removed from him is moot. We cannot grant any effective relief nor avoid any specific legal or practical consequence by reversing the jurisdictional finding because (1) it is undisputed that jurisdiction was proper given Mother's no contest plea to the allegations against her, and (2) the court is no longer asserting jurisdiction. The removal order is similarly moot. As the dependency case is now concluded, the children are no longer removed from Father's care. The children are living with Mother (as they were for years before the dependency case started) and Father now has guaranteed visitation with them (instead of visitation at Mother's option as was the case beforehand).[4]

When an appeal is moot, we nevertheless retain discretion to consider it on the merits. (*In re D.P.* (2023) 14 Cal.5th 266,

___

[4] We say at Mother's option because she was able to give Father an ultimatum that he would not be able to see the children if he did not address his drug problem.

10

283.)  In assessing whether to "exercise discretionary review of a moot appeal" (*id.* at p. 286), we may consider among other things "whether the challenged jurisdictional finding 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' or ' "could have other consequences for [the appellant], beyond jurisdiction." ' "  (*Id.* at p. 285.)  Here, the court's factual findings supporting its assertion of jurisdiction and its initial order removing the children from Father could have potentially factored into the exit orders the court later entered.  Father has appealed those orders, and not addressing whether substantial evidence supported the orders at issue in this appeal could unfairly tilt the playing field in that pending appeal.  Accordingly, we exercise our discretion to reach the merits of Father's appeal.

**B.  Substantial Evidence Supports the Jurisdictional Finding Based on Father's Conduct**

### 1.  *Relevant Law and Standard of Review*

For the juvenile court to assert jurisdiction based on Father's conduct, a preponderance of the evidence must have shown that the children were at substantial risk of suffering serious physical harm due to Father's inability to provide regular care due to his substance abuse.  (§ 300, subd. (b)(1)(D).)  As relevant here, dependency jurisdiction under section 300, subdivision (b)(1)(D) requires evidence of: (1) Father's substance abuse, (2) Father's inability to provide regular care for the children because of that substance abuse, and (3) resulting significant risk of serious physical harm.  (*In re N.R.* (2023) 15 Cal.5th 520, 556.)

Section 300, subdivision (b)(1) requires that "a significant risk to the child must exist ' "at the time of the jurisdiction

11

hearing." ' " (*In re J.N.* (2021) 62 Cal.App.5th 767, 775.) Previous acts of neglect, standing alone, do not establish a substantial risk of harm; there must be some reason beyond mere speculation to believe they will reoccur. (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602.) Evidence of past conduct, however, can show a current risk of harm if there is a reason to believe the conduct will reoccur. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1394.) " 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

We review jurisdictional findings for substantial evidence in light of the entire record. (*In re I.C.* (2018) 4 Cal.5th 869, 892.) " 'To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.' " (*In re Cole L.*, *supra*, 70 Cal.App.5th at p. 602.) "We do not evaluate the credibility of witnesses, reweigh the evidence, or resolve evidentiary conflicts." (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.) We "draw all reasonable inferences in support of the findings, consider the record most favorably to the juvenile court's order, and affirm the order if supported by substantial evidence even if other evidence supports a contrary conclusion." (*Ibid*.)

2.    *Analysis*

Father does not dispute that he had a history of methamphetamine abuse and was a recent abuser of marijuana and alcohol. He insists that he used no substances after DCFS placed the children in protective custody, and that his past use did not indicate he was now unable to care for the children or

12

posed any substantial risk to their well-being as of the time of the jurisdiction hearing.

The record discloses substantial evidence supporting the court's jurisdictional finding as to the interlineated substance abuse allegation against Father. Father was impaired by marijuana through the middle of November 2024—in other words, less than three weeks before the jurisdictional hearing began. Father tested positive for marijuana on October 24, 2024, and continued to test positive on November 5 and 13, 2024. Father points out that his testing levels decreased over that period, but the trial court described even the smallest of these figures as continuing to demonstrate intoxication, noting it was still "well over what would be considered an intoxicated amount if there was a [driving under the influence] analysis." Father did not test positive for alcohol, but both Mother and MGM indicated that Father continued to drink. Additionally, there was evidence that Father refused to take prescribed medication to ameliorate cravings that led to his substance abuse.

This case is accordingly unlike *In re S.F.* (2023) 91 Cal.App.5th 696, upon which Father relies. In that case, it was undisputed the father " 'used to abuse crack cocaine and alcohol but that he [was] about [two] years sober.' " (*Id*. at p. 717.) As there was no evidence the father had a current substance abuse problem, the appellate court held it was error to assert dependency jurisdiction based on the father's past substance abuse because he had two undisputed years of sobriety before the adjudication hearing. (*Id*. at pp. 717-718.) Here, in contrast, Father had not been indisputably sober for two years, one year, or even a few months. There was evidence that he continued to drink alcohol, and that he had abused marijuana at least once in

13

the weeks before the jurisdiction hearing in an amount sufficient that he was still intoxicated by the time of a drug test shortly before the jurisdiction hearing.

There was also substantial evidence that Father's use of substances impaired his ability to care for the children and posed substantial risk to them. Mother indicated that when Father drank, he did so to numb long-term physical pain. It was reasonable for the juvenile court to infer that alcohol consumption in an amount sufficient to numb chronic pain would adversely impact Father's physical and mental faculties to a concerning degree. Mother also stated that when Father had even a small amount of alcohol, his personality could change and when it did she needed to intervene to remove the children from him. In addition, Father's marijuana use was extremely recent, produced multiple positive tests, and even the lowest positive test was in an amount sufficient to impair his ability to care for the children. The fact that Father said he stopped using marijuana shortly before the jurisdiction hearing did not require the court to infer Father had stopped using marijuana altogether. Unlike the parent in *In re S.F.*, *supra*, 91 Cal.App.5th 696, Father's track record of sobriety was so short that, when combined with his admission that he had occasionally backslid on his sobriety with marijuana and alcohol and Mother's statement that he continued to self-medicate with alcohol, the court was not required to credit Father's statement that he would no longer use marijuana or alcohol in amounts that posed substantial risk to the children's well-being.

14

## C.  Substantial Evidence Supports the Removal Order

### 1.  *Relevant Law and Standard of Review*

A juvenile court may not remove a child from a parent's care unless it finds by clear and convincing evidence that there is (1) "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home," and (2) "there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parents' . . . physical custody."  (§ 361, subd. (c)(1).)

When reviewing " 'a dispositional order removing a child from a parent we apply the substantial evidence standard of review, keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence.' [Citations.]  ' " 'The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record.' " ' " (*In re I.R.* (2021) 61 Cal.App.5th 510, 520-521.)

The same reasons that support the court's jurisdictional finding against Father—namely his history of methamphetamine abuse coupled with evidence he was still abusing marijuana and alcohol—support the court's finding that there was a substantial danger to the minors if they were returned to his care. Additionally, alternatives to removal from Father did not exist. Father could not take the children because his registered sex offender roommate posed substantial risk,[5] and in any event

---

[5] Father claimed to DCFS that this roommate moved out before the adjudication-disposition hearing.  There is no indication DCFS was able to confirm Father's representation, and

15

Father did not have enough room for the children to reside with him.  Nor did Father have anywhere to place the children as his sister, the only available alternative, already had a full house.

## DISPOSITION

The juvenile court's jurisdictional and removal orders are affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

---

counsel for DCFS stated without objection at the disposition hearing that Father was still "residing with a sexual predator."